UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZENON FLORES, | No. 1:16-cv-00403-LJO-JLT (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| S. FRAUENHEIM, | **[TWENTY-ONE DAY OBJECTION DEADLINE]** |
| Respondent. | |

Petitioner is currently serving an indeterminate sentence of twenty-five-years-to-life plus twenty-six years for committing multiple sex acts with his stepdaughter when she was nine and thirteen years old. He has filed the instant habeas action claiming: 1) His confession should have been excluded because it was obtained in violation of Miranda[1]; 2) His confession was involuntary and a product of psychological coercion and improper promises of leniency. As discussed below, the Court finds that the state court's determinations were not contrary to or an unreasonable application of clearly established Supreme Court precedent and recommends the petition be **DENIED.**

**I.     PROCEDURAL HISTORY**

Petitioner was convicted in the Kern County Superior Court on April 2, 2013, of: (1)

---
[1] Miranda v. Arizona, 384 U.S. 436 (1966).

1

sexual intercourse or sodomy with a child 10 years old or younger (Cal. Pen. Code § 288.7(a));

(2) oral copulation or sexual penetration of a child 10 years old or younger (Cal. Penal Code §

288.7(b)); (3) two counts of sodomy against the will of a victim under 14 years old by force,

violence, duress, menace, or fear of bodily injury (Cal. Penal Code § 286(c)(2)(b)); (4) oral

copulation by a perpetrator older than 21 with a person under 16 (Cal. Penal Code § 288a(b)(2));

and (6) a lewd act against a person under 14 (Cal. Penal Code § 288(a)). People v. Flores, No.

F067133, 2015 WL 3796273, at *1 (Cal. Ct. App. June 17, 2015).

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

DCA"). The Fifth DCA affirmed the judgment on June 17, 2015. Id. Petitioner filed a petition

for review in the California Supreme Court, and the petition was summarily denied on September

9, 2015. (LD[2] 5, 6.)

On January 5, 2016, Petitioner filed the instant petition for writ of habeas corpus in this

Court. (Doc. No. 1.) Respondent filed an answer on June 23, 2016. (Doc. No. 15.) Petitioner

filed a traverse on October 14, 2016. (Doc. No. 21.)

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[3]:

> At trial, the victim, then 14 years old, testified that she considered Flores to be her
> stepfather; he lived with her mother but was not married to her. She testified that,
> from the time she was 9 until she was 13, Flores subjected her to sex acts around
> 20 times. She said yes when asked whether, each time, "[h]e would put his penis in
> your butt" and "he would touch your boobs." He made her touch his penis on
> about half of these occasions. She told him to stop or she would tell her mother.
> He did not stop. He said if she told, he would do something to her mother. He
> showed her pornographic movies and said she had to watch them.
>
> She did not remember seeing blood or feeling pain when Flores put his penis in her
> buttocks. She saw "white stuff" each time.
>
> The victim testified about several specific instances of molestation by Flores. The
> first time, she was nine. Flores grabbed her while she was sleeping and took her to
> the bathroom. He put his hands inside her clothing and touched her breasts and
> buttocks. He grabbed her hands and made her touch his penis. She told him to stop
> but he did not stop. Flores made the victim touch his penis another time when she

---

[2] "LD" refers to the documents lodged by Respondent with the answer.

[3] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).
Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
2009).

was nine and then made her bend over and, she said, "put his penis in my butt." She did not know whether his penis entered her anus, but it at least pressed against her anus. Subsequently, "[w]hite stuff came out" of Flores's penis and fell on the floor.

The victim testified that she did not think Flores ever put his penis in her mouth, but she was not sure. She also said he never touched her vagina.

Dr. John Digges testified that he examined the victim on January 30, 2012. Digges was a child abuse physician employed by Kern County at the Child Assessment Center at Kern Medical Center. The victim had been brought to him, he was told, because of allegations of sexual touching that took place starting when she was nine. The examination yielded normal results. There were no injuries indicating penetration of the genitals or anus. The anus, however, could have been penetrated repeatedly without any detectable injury remaining by the time of the examination. The findings were consistent with both anal penetration and abuse by rubbing the penis against the exterior of the anus.

Flores was interviewed at a police station by detectives César Ollague and James Conner. Flores spoke Spanish during the interview, and Ollague, who is bilingual, interpreted for both Flores and Conner. A recording of the interview was played for the jury. At first, Flores denied ever touching the victim sexually. Eventually, however, he said the victim touched his penis when she was about 9 or 10, and that he had vaginal intercourse with her three or four times starting when she was 13. Flores ejaculated but not inside the victim. Flores also said the victim put her mouth on his penis more than 20 times. He touched the victim's breasts and kissed her mouth when they had intercourse, but he denied that he put his mouth on her vagina. The last time he had sex with the victim was about 15 days before the interview. On that occasion, there might have been either vaginal or anal intercourse. Flores said the sex acts were consensual and the victim never told him to stop. At the end of the interview, Flores complied with the detectives' request that he write a letter to the victim. In the letter, Flores apologized and promised never to do "these things" again. Conner said Flores would need to be more specific, so Flores added that there would be no more sexual relations.

Flores, 2015 WL 3796273, at *1–2.

## III.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

3

1    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

2    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

3    enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

4    filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

5    and is therefore governed by its provisions.

6        B.    Legal Standard of Review

7        A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

8    the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

9    that was contrary to, or involved an unreasonable application of, clearly established Federal law,

10   as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

11   based on an unreasonable determination of the facts in light of the evidence presented in the State

12   court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

13   Williams, 529 U.S. at 412-413.

14       A state court decision is "contrary to" clearly established federal law "if it applies a rule

15   that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

16   of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

17   different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

18   406).

19       In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

20   an "unreasonable application" of federal law is an objective test that turns on "whether it is

21   possible that fairminded jurists could disagree" that the state court decision meets the standards

22   set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

23   application of federal law is different from an incorrect application of federal law.'"  Cullen v.

24   Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

25   a federal court "must show that the state court's ruling on the claim being presented in federal

26   court was so lacking in justification that there was an error well understood and comprehended in

27   existing law beyond any possibility of fairminded disagreement."  Harrington, 562 U.S. at 103.

28       The second prong pertains to state court decisions based on factual findings.  Davis v.

Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)).

Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's

factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable

among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-

1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to

the last reasoned state court decision as the basis of the state court's decision. See Ylst v.

Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir.

2004). "[A]lthough we independently review the record, we still defer to the state court's

ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error

had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)

(holding that the Brecht standard applies whether or not the state court recognized the error and

reviewed it for harmlessness).

C.    Review of Claims

1.    Interrogation

Petitioner first claims that the trial court should have excluded his confession to police

investigators because he was in custody and subjected to interrogation without having been given

his Miranda warnings.

Petitioner presented this claim to the state courts on direct review. In the last reasoned

decision, the Fifth DCA rejected the claim, as follows:

> A criminal defendant's confession must be excluded from evidence if it was
> obtained during a custodial interrogation and the officers did not read the
> defendant his *Miranda* rights. (*Miranda, supra*, 384 U.S. at pp. 444–445.) Before
> trial, Flores moved unsuccessfully to suppress his confession on the grounds that it
> was obtained during a custodial interrogation before which he was not informed of

his rights. He renews this contention on appeal. It is undisputed that the officers did not read Flores his *Miranda* rights, so the question to be decided is whether he was in custody when he made his statements in response to the detectives' questions.

The question of whether a defendant was in custody for *Miranda* purposes is a mixed question of fact and law that we review independently. (*Thompson v. Keohane* (1995) 516 U.S. 99, 112–113.) To the extent the facts are disputed, we apply the substantial evidence standard to the trial court's factual findings regarding the circumstances of the interrogation. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400 (*Leonard*).) Here, the facts are undisputed since they are preserved in the record in the form of a video recording of the interview and an audio recording of the discussion that took place when the detectives met Flores at his home and drove him to the sheriff's department. This leaves for our independent review the question of whether "'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave.'" (*Ibid*.)

This issue is judged by an objective test. Where, as here, the defendant has not been formally arrested, the question is whether a reasonable person would believe his or her freedom of movement was restricted to the degree associated with arrest. (*Leonard, supra*, 40 Cal.4th at p. 1400; *California v. Beheler* (1983) 463 U.S. 1121, 1125.) Some of the specific factors relevant to this determination involve the physical facts of the interrogation and its setting: how long the interview lasted; where the interview took place (e.g., in the defendant's home or in a closed interview room at a police station); whether there were physical restraints on the defendant's movement; how many officers were present; and whether the defendant was arrested at the end of the interview. Other factors pertain to the likely psychological impact of the circumstances on a reasonable person: whether the defendant was informed that he or she was not under arrest and was free to leave; whether the officers told the defendant he or she was a suspect, as opposed to merely a witness; whether the officers pressured the defendant or dominated the interrogation; whether the officers' demeanor and tactics were aggressive, confrontational, or accusatory; and whether the officers said they had evidence proving the defendant's guilt. (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403–1404; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162; People v. Forster (1994) 29 Cal.App.4th 1746, 1753.) No one factor controls, and the determination is made based on the totality of the circumstances. (*People v. Morris* (1991) 53 Cal.3d 152, 197, overruled on other grounds by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

The parties rely on the following facts about the interrogation. Flores, an unemployed farm laborer, had a sixth-grade education. He spoke only Spanish and had to rely on Ollague as an interpreter to communicate with Conner. When the detectives arrived at Flores's house, they told him they were investigating a case they thought he was involved in and they asked whether he would come voluntarily to the sheriff's department to talk. They would give him a ride there and bring him back home afterward. Flores agreed to go. The detectives asked whether he knew why they wanted to talk to him. Flores said he knew it was related to the fact that the children had been removed from the house by CPS.

At the sheriff's department, Flores, Ollague, and Conner sat down in the interview room. Ollague closed the door. The detectives told Flores he was not under arrest and could leave at any time. Flores said he understood. When asked if he knew why he had been brought there, Flores said it was because his stepdaughter had accused him of "violence, mistreatment and/or rape."

The detectives said Flores should not lie because they knew things about the case Flores did not know. When Flores denied wrongdoing, the detectives said they knew he was lying because they had evidence against him, including scientific evidence. If Flores talked about it, then "it can be resolved already and take off all the bad things that you did...." Ollague said, "You touched [the victim] and that's okay but you have to say it right now." Flores emotionally confirmed the detectives' belief that he had been sexually abused as a child. Encouraging Flores to discuss this abuse, Ollague said he was not just a detective, but he had a heart and he understood. Ollague moved his chair closer to Flores, touched Flores's arm, and spoke in a confidential tone. Flores thanked him and said he trusted the detectives. Then Ollague insisted that the same thing, sexual abuse, had happened to the victim in this case. When Flores continued to deny the accusations, Ollague said God was watching and saw Flores lying. Flores had mentioned that he and his family attended church, and he agreed when Ollague said God knows everything.

Ollague told Flores the situation could be "resolved," his heart could be "repaired," and "[w]e can repair all of this" if Flores told the truth. If Flores told the truth, Ollague said, Flores could "go to church saying, 'Okay, everything left me from my body now because now I told the truth.'"

After Flores confessed to having sex with the victim and wrote the apology letter, he told the detectives he felt relieved, even more than when he prayed to God about it. When the detectives arrived at his house, Flores wondered what would happen to him, but now he trusted God and the detectives and felt better. Ollague said that Conner would now handcuff Flores and arrest him for having sex with a minor, and would explain what would happen next. Ollague continued, "Number one is help, okay? Number two is to try to figure out how we're going to fix all this, okay?" Flores thanked him. The interview lasted about an hour and 30 minutes.

We consider, first, the factors that might be thought to weigh in favor of finding that Flores was in custody. Flores was an unsophisticated interview subject. The interview took place at a police station, in an interview room, with the door closed. Two officers confronted Flores. He was driven to the station by the officers and would have had to find his own way home had he decided to leave. It was made clear that Flores was a suspect and not just a witness. The officers were dogged and persistent in their questioning; they insisted that they already knew the truth and that Flores was lying when he denied wrongdoing. They used powerful persuasive techniques, saying that if he confessed, the situation would be repaired, things would be better for him and his family, he would experience an emotional release, and he would put himself right in the eyes of God. At the end of the interview, Flores was arrested.

Against these, we weigh factors that tend to show Flores was not in custody. Flores left his home and went voluntarily to the police station after confirming he knew why the detectives wanted to question him. The detectives told Flores he was not under arrest and was free to leave. He said he understood this. In the video recording, there appear to be no physical barriers that would have prevented Flores from leaving the interview room at any time. The detectives were seated throughout the interview except when entering or leaving the room. Although they accused him of crimes and could be said to be applying psychological pressure, they never raised their voices, used an angry or intimidating tone, or struck physically domineering or menacing postures. Their tone throughout was determined but polite and calm.

7

1    In our view, the balance of these factors tips against a determination that Flores
2    was in custody. An objective person might indeed find the persuasive and
     emotional pressure to confess to be strong under these circumstances. But we do
3    not think such a person would have felt he or she could not leave.

4    Flores cites *People v. Aguilera, supra*, 51 Cal.App.4th 1151, several times to
     support his argument that the various psychological tactics the detectives used—
5    saying they already knew what happened and Flores was lying, for instance—
     meant he would reasonably conclude he could not leave. Certain key facts in
6    *Aguilera* distinguish it from this case, however. Aguilera's interrogators said the
     interview would end only "*after* he told them the truth," implying that he could not
7    leave until he said what they wanted him to say. They also expressly told him he
     could not leave if they had to go interview a witness he had said could provide an
8    alibi. (*Id*. at p. 1163.) The officers said Aguilera was not in custody, but they did
     not say he was free to leave when he wished. (*Id*. at p. 1164.) The interrogation
9    went beyond being intense and persistent and became "threatening and
     intimidating." (*Id*. at p. 1165.) These factors are not present in this case.

10   Flores cites *People v. Esqueda* (1993) 17 Cal.App.4th 1450. This case also is
     distinguishable. There was no evidence that Esqueda voluntarily agreed to
11   accompany police to a police station from a gas station where he was found. (*Id*. at
     p. 1482.) Further, "[t]hroughout the interview Esqueda was crying, moaning, and
12   often confused," and "had been drinking and was hysterical at times," rendering
     his mental condition "suspect." (*Id*. at pp. 1482–1483.) Relying on this case, Flores
13   says his mental condition also was suspect because he had just revealed that he had
     been molested as a child. The situation is not similar, however. Flores expressed a
14   certain amount of emotion, but he never cried or moaned or became confused or
     hysterical.
15
     For all the above reasons, we conclude that, under the totality of the
16   circumstances, a reasonable person in Flores's shoes would not have believed he
     lacked freedom to leave, as if he had been under arrest.
17

18   Flores, 2015 WL 3796273, at *2–5.

19            a.   Legal Standard

20       The Fifth Amendment provides that "no person shall be compelled in any criminal case to

21   be a witness against himself." A suspect subject to custodial interrogation has a Fifth

22   Amendment right to consult with an attorney, and the police must explain this right prior to

23   questioning. Miranda v. Arizona, 384 U.S. 436, 469–73 (1966). In Miranda, the United States

24   Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or

25   inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

26   use of procedural safeguards effective to secure the privilege against self-incrimination." 384

27   U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential

28   defendant that he or she has the right to consult with a lawyer, the right to remain silent and that

                                                    8

anything stated can be used in evidence against him or her.  Id. at 473–74.  These procedural

requirements are designed "to protect people against the coercive nature of custodial

interrogations."  DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

"Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but

only in those types of situations in which the concerns that powered the decision are implicated."

Berkemer v. McCarty, 468 U.S. 420, 437 (1984). Although "those types of situations" may vary,

they all share two essential elements: "custody and official interrogation." Illinois v. Perkins, 496

U.S. 292, 296–97 (1990).

To determine whether an individual was in custody, a court must, after examining all of

the circumstances surrounding the interrogation, decide "whether there [was] a formal arrest or

restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v.

California, 511 U.S. 318, 322 (1994) (internal quotation marks omitted).  The inquiry focuses on

the objective circumstances of the interrogation, not the subjective views of the officers or the

individual being questioned.  Id. at 323.  Thus, the court must determine whether "the officers

established a setting from which a reasonable person would believe that he or she was not free to

leave." United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir.), *modified by* 830 F.2d 127

(9th Cir.1987); see also U.S. v. Hayden, 260 F.3d 1062, 1066 (9th Cir. 2001).  The Ninth Circuit

has noted the following factors to be relevant to deciding that question: "(1) the language used to

summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt;

(3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the

degree of pressure applied to detain the individual." Hayden, 260 F.3d at 1066 (citing Beraun–

Panez, 812 F.2d at 580).  "Other factors may also be pertinent to, and even dispositive of, the

ultimate determination whether a reasonable person would have believed he could freely walk

away from the interrogators; the Beraun–Panez/Hayden factors are simply ones that recur

frequently." United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

Error in admitting statements obtained in violation of Miranda is deemed harmless for

purposes of federal habeas review unless the error "had substantial and injurious effect or

influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993);

1  Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).

2                     b.  Analysis

3        In this case, the Fifth DCA applied clearly established Supreme Court precedent.

4  Therefore, the question for this Court is whether that application was unreasonable.  In light of

5  the record, a rational jurist could conclude that the state court determination that Petitioner was

6  not in custody at the time of the confession was reasonable.

7        In determining whether suspects were "in custody" for Miranda purposes, the Supreme

8  Court has considered whether they voluntarily approached or accompanied law officers

9  understanding that questioning would ensue.  See California v. Beheler, 463 U.S. 1121, 1125

10  (1982) (per curiam) (holding that defendant was not in custody when he agreed to accompany

11  police to the station to answer questions and was allowed to leave immediately afterward);

12  Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (holding that defendant was not in custody when

13  he came to the station voluntarily and left "without hindrance" after 30 minutes of questioning).

14  The Ninth Circuit has also found that suspects were not in custody where the circumstances

15  included volunteering to answer law officers' questions.  See, e.g., Hayden, 260 F.3d at 1066–67;

16  United States v. Hudgens, 798 F.2d 1234, 1236–37 (9th Cir.1986).  Here, Petitioner voluntarily

17  accompanied the detectives to the police station after telling them he understood why they wanted

18  to talk to him.  "If the police ask—not order—someone to speak to them and that person comes to

19  the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end

20  the encounter."  Kim, 292 F.3d at 974-75.

21        However, "[i]f an individual voluntarily comes to the police station or another location

22  and, once there, the circumstances become such that a reasonable person would not feel free to

23  leave, the interrogation can become custodial."  Kim, 292 F.3d at 975.  In this case, after arriving

24  at the sheriff's office, the detectives informed Petitioner that he was not under arrest and could

25  leave at any time.  There did not appear to be any physical barriers that would have prevented

26  Petitioner from leaving.  The detectives were seated the whole time and did not raise their voices

27  or use an angry or intimidating tone.  Although the detectives employed persuasive and emotional

28  pressure, they were polite and calm the entire time and they did not take physically domineering

or menacing postures. A rational jurist could conclude that the encounter did not become so coercive that a reasonable person in Petitioner's circumstances would not have felt free to leave. See Hayden, 260 F.3d at 1066 (the defendant "was told explicitly that she was free to leave at anytime," her "ability to leave was [not] in any other way restrained," and "the duration of the interviews was [not] excessive[and] undue pressure was [not] exerted"); United States v. Gregory, 891 F.2d 732, 735 (9th Cir.1989) (the defendant "consented to be interviewed . . . and no coercion or force was used"); Hudgens, 798 F.2d 1234 (the defendant voluntarily entered a police car to talk to the police and the agents did not use intimidating or coercive language during the interview). Therefore, under all of the circumstances, a rational jurist could conclude that Petitioner was not in custody for Miranda purposes .

Even if the state court erred, Petitioner fails to demonstrate prejudice. Although a confession can be powerful evidence, excluding it in this case would not have altered the judgment since the evidence against Petitioner was overwhelming. The victim testified to all of the instances of molestation. The evidence was detailed and graphic. In addition, a child abuse physician who examined the victim corroborated her testimony. (RT 687-710.) Therefore, any error could not have had a substantial and injurious effect on the verdict. The claim should be denied.

2.     Confession

Petitioner next claims his confession was involuntary because he was psychologically coerced with improper religious arguments and promises of leniency. This claim was presented on direct review as well. In the last reasoned decision, the Fifth DCA analyzed the claim as follows:

> Flores argues that his confession was involuntary and therefore its admission into evidence violated his right to due process of law. He contends that if his trial counsel forfeited this issue by failing to raise it in the trial court, then this failure denied him effective assistance of counsel. We review the issue of involuntary confessions independently, except that we review for substantial evidence the trial court's findings on disputed facts about the circumstances surrounding a confession. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1093, overruled on other grounds by *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Again, the facts are undisputed here in light of the video recording. As we will explain, there was neither a violation of due process nor ineffective assistance of counsel through failure to object because Flores's confession was not involuntary.

11

State and federal constitutional due process principles bar the use against a criminal defendant of the defendant's involuntary confession. (*Jackson v. Denno* (1964) 378 U.S. 368, 376; *People v. Massie* (1998) 19 Cal.4th 550, 576.) A confession is involuntary if it is not the product of the defendant's free will and rational intellect. (*Mincey v. Arizona* (1978) 437 U.S. 385, 398; *Miller v. Fenton* (1985) 474 U.S. 104, 110; *People v. Maury* (2003) 30 Cal.4th 342, 404.) The test is whether the defendant's will was overborne at the time of the confession. (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534; *Maury, supra*, at p. 404.) When a defendant challenges the voluntariness of a confession, the prosecution has the burden of proving voluntariness by a preponderance of the evidence. (*Lego v. Twomey* (1972) 404 U.S. 477, 489; *Massie, supra*, at p. 576.)

Both physical and psychological forms of coercion are relevant. (*Rogers v. Richmond* (1961) 365 U.S. 534, 540.) Factors specific to a particular defendant are among those that should be considered. (*People v. Guerra, supra*, 37 Cal.4th at p. 1093.) Factors courts have deemed significant include violence; threats; promises; deception; the length and location of the interrogation; and the defendant's age, maturity, education, sophistication, experience with the criminal justice system; and physical, mental, and emotional condition. (*People v. Williams* (1997) 16 Cal.4th 635, 660; *In re Shawn D.* (1993) 20 Cal.App.4th 200, 209; *People v. Maury, supra*, 30 Cal.4th at pp. 404–405.) A court must consider the totality of circumstances surrounding a defendant's statement when deciding whether the statement was voluntarily or involuntarily made. (*Dickerson v. United States* (2000) 530 U.S. 428, 434; *Guerra, supra*, at p. 1093.)

The record in this case demonstrates by a preponderance of the evidence that Flores's confession was voluntary. Having come voluntarily to the police station, and having been persuaded by reasons of conscience that it was the right thing to do, Flores described specific sex acts in which he engaged with the victim. The detectives' persistence and use of psychological techniques undoubtedly had a role in Flores's decision to change his story and confess. In the recording of the interview, however, we see scant indication that his ability to act according to his own will was taken away from him by these techniques. Instead, the impression given by Flores in the recording is that of a man who has been persuaded to make his own decision to be truthful.

Flores argues that his will was overborne by the detectives' invocation of God, which, he maintains, was an improper exploitation of the detectives' knowledge of Flores's religious beliefs. He also suggests the detectives' references to religion were especially coercive because the detectives drew a parallel between Flores's abuse of the victim and the abuse Flores suffered as a child; and they alluded to God's knowledge of both situations.

To support the notion of religious coercion, Flores relies on *People v. Adams* (1983) 143 Cal.App.3d 970, overruled on other grounds in *People v. Hill* (1992) 3 Cal.4th 959, 995, footnote 3. Adams was suspected of murder. The sheriff, who knew Adams from church and knew she was suffering from nervousness and sleeplessness, interviewed her. Citing specific biblical passages, the sheriff told Adams that if she denied her guilt, God would turn his back on her. Then he told her about a book written by a minister that described a woman who was placed in a mental institution because she was consumed by debilitating guilt over the sin of an adulterous relationship. The sheriff told Adams she was similar to the woman in the book and might have a nervous breakdown unless she confessed because of her failure to adhere to God's law. (*Id*. at pp. 979–981, 988–989.) The book said people in mental institutions are not mentally ill but are debilitated by guilt over

12

their sins. Adams also thought she was similar to the woman in the book because she had been living with but not married to the murder victim. She feared she would go to a mental institution and then suffer eternal damnation if she did not change her story. She said she confessed for these reasons. (*Id*. at p. 986.) Primarily because of these facts, the Court of Appeal held that Adams's statement was involuntary and should have been excluded from evidence. (*Id*. at p. 990.)

Despite some strong language in the opinion, [FN3] we do not understand Adams to hold that an interrogator's suggestion that God wants a suspect to tell the truth necessarily renders a subsequent confession involuntary. The test of voluntariness is unchanged by the use of this tactic: We still must determine, in light of the totality of the circumstances, whether the suspect's will was overborne. The Adams court acknowledged this and described the totality of the circumstances there as "an overwhelming and calculated appeal to the emotions and beliefs, focusing appellant's fears in an area the sheriff knew appellant to be particularly vulnerable." (*People v. Adams, supra*, 143 Cal.App.3d at p. 986.)

> [FN3] "Religious beliefs are not matters to be used by governmental authorities to manipulate a suspect to say things he or she otherwise would not say. The right to worship without fear is too precious a freedom for us to tolerate an invasion and manipulation by state officials of the religious beliefs of individuals, including those accused of crime." (*People v. Adams, supra*, 143 Cal.App.3d at p. 989.)

In this case, Flores may well have been concerned about God's knowledge of his actions, but the detectives used nothing comparable to the interrogator's methods in Adams. The detectives did not tell Flores that, because of his failure to conform to God's law, he would be consumed with feelings of guilt, have a nervous breakdown, and be confined to a mental institution. There is no indication that Flores believed he would suffer eternal damnation if he did not confess. The detectives' references to God and to Flores's religious feelings in this case amounted to no more than an appeal to his conscience or a way of saying that telling the truth was the right thing to do. This kind of appeal is not an unconstitutional form of pressure. We see no indication here that it deprived Flores of his power of voluntary action.

Flores also relies on *People v. Montano* (1991) 226 Cal.App.3d 914, in which the interrogator used "religion to conjure up in defendant's mind the picture of confessing to avoid going to hell." (*Id*. at p. 935.) This was only one of many factors in *Montano*, however. The officers ignored Montano's 10 invocations of his right to remain silent. He was 18 years old and drunk when the interrogation began. (*Id*. at pp. 935–936.) The officers "conveyed the unmistakable message that defendant's rights were meaningless." (*Id*. at p. 936.) Montano was interrogated through the night despite his pleas of fatigue and lack of sleep. (*Ibid*.) Flores's case is not similar.

Flores next argues that his confession was involuntary because it was made in response to implied promises of leniency. He says the detectives implicitly promised lenient treatment when they said he could fix, repair, and resolve matters by admitting to the abuse.

*People v. Vasila* (1995) 38 Cal.App.4th 865, which Flores cites, actually shows that this argument lacks merit. The *Vasila* court quoted the standard for the promised-leniency doctrine as stated by our Supreme Court in *People v. Hill* (1967) 66 Cal.2d 536, 549: "When the benefit pointed out by the police to a

1    suspect is merely that which flows naturally from a truthful and honest course of
     conduct, we can perceive nothing improper in such police activity. On the other
2    hand, if in addition to the foregoing benefit, or in the place thereof, the defendant
     is given to understand that he might reasonably expect benefits in the nature of
3    more lenient treatment at the hands of the police, prosecution or court in
     consideration of making a statement, even a truthful one, such motivation is
4    deemed to render the statement involuntary and inadmissible." It was later
     specifically held by our Supreme Court that, to render a confession involuntary, a
5    promise of leniency must be "the motivating cause of defendant's admissions."
     (*People v. Williams, supra*, 16 Cal.4th at p. 661.)
6
     Vasila was told that if he gave the police specific information, a federal
7    prosecution would not be instituted, and Vasila would be released on his own
     recognizance. (*People v. Vasila, supra*, 38 Cal.App.4th at p. 874.) The Court of
8    Appeal held that Vasila was motivated by this promise to make incriminating
     statements, which, consequently, were inadmissible. (*Id*. at p. 876.)
9
     In this case, the detectives did not expressly offer Flores any reduction in the
10   consequences he might face from the authorities. We also do not think they
     impliedly offered any such leniency. The detectives' references to repairing,
11   resolving, and fixing the situation were undoubtedly meant to focus Flores on the
     idea that his feelings of tension might be relieved if he confessed and perhaps also
12   to distract him from the idea that he will be punished. We do not think this tactic
     can, by itself, be reasonably interpreted as a promise of lenient treatment by the
13   authorities. There is no evidence that Flores interpreted it that way.

14   In sum, the record shows by a preponderance of the evidence that Flores's
     confession was not involuntary. The kinds of persuasion the officers applied in the
15   interview, while effective, were not the kinds that have been deemed by courts to
     be coercive.
16

17   Flores, 2015 WL 3796273, at *5–7.

18            a.   Legal Standard

19         The Fourteenth Amendment to the United States Constitution demands that confessions be

20   made voluntarily. See Lego v. Twomey, 404 U.S. 477, 483-85 (1972).  A confession is voluntary

21   only if it is "'the product of a rational intellect and a free will.'"  Medeiros v. Shimoda, 889 F.2d

22   819, 823 (9th Cir.1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)); see also

23   Blackburn v. Alabama, 361 U.S. 199, 208 (1960).  An admission is involuntary "if coerced either

24   by physical intimidation or psychological pressure."  Mickey v. Ayers, 606 F.3d 1223, 1233 (9th

25   Cir.2010) (citing United States v. Shi, 525 F.3d 709, 730 (9th Cir.2008)).

26         In determining whether a confession is voluntary, a court "examines whether a defendant's

27   will was overborne by the circumstances surrounding the giving of a confession." Dickerson v.

28   United States, 530 U.S. 428, 434 (2000).  "The line of distinction is that at which governing self-

                                                    14

1  direction is lost and compulsion, of whatever nature or however infused, propels or helps to

2  propel the confession." Culombe v. Connecticut, 367 U.S. 568, 602 (1961). "Coercive police

3  activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning

4  of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157,

5  167 (1986). Voluntariness is to be determined in light of the totality of the circumstances. Miller

6  v. Fenton, 474 U.S. 104, 112 (1985); Haynes v. Washington, 373 U.S. 503, 513 (1963).

7             b.  Analysis

8        In this case, the state court applied the correct legal standard; therefore, the only question

9  is whether that application was reasonable. The Court finds that a rational jurist could conclude

10  that the decision was reasonable.

11        As to the detectives' religious arguments, Petitioner fails to cite any Supreme Court

12  authority which forbids the use of religious references and renders any resulting confession

13  inadmissible. For this reason, Petitioner cannot demonstrate that the state court decision was

14  contrary to or an unreasonable application of clearly established Supreme Court authority. In

15  addition, the detectives' comments were not coercive to the point that Petitioner's will was

16  "overborne." Rather, under the circumstances, it can reasonably be concluded that Petitioner's

17  confession was the product of his own decision to clear his conscience.

18        With respect to the alleged promises of leniency, the state court reasonably found that

19  Petitioner's will was not overborne. The court considered the circumstances of the interrogation

20  and the statements of the detectives. The detectives did not make any express offers of leniency.

21  In addition, there is no indication that Petitioner understood that he would be granted leniency if

22  he confessed. A rational jurist could conclude that Petitioner's confession was voluntary. In

23  addition, as previously stated, any error in admitting the confession was harmless.

24        Petitioner fails to show that the state court denial of his claim was contrary to or an

25  unreasonable application of Supreme Court authority. The claim should be denied.

26  **IV.    RECOMMENDATION**

27        Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be

28  **DENIED** with prejudice on the merits.

15

1       This Findings and Recommendation is submitted to the United States District Court Judge

2 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the

3 Local Rules of Practice for the United States District Court, Eastern District of California. Within

4 twenty-one days after being served with a copy of this Findings and Recommendation, any party

5 may file written objections with the Court and serve a copy on all parties. Such a document

6 should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies

7 to the Objections shall be served and filed within ten court days (plus three days if served by

8 mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling

9 pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections

10 within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez</u>

11 <u>v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

12

13 IT IS SO ORDERED.

14    Dated:   **May 19, 2017**                      **/s/ Jennifer L. Thurston**

                                                   UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28